## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Greenbelt Division

| | |
|---|---|
| JANE DOE | ) |
| [address confidential/sex abuse of a minor] | ) |
| Clearwater, Florida 33756 | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| FRIENDS COMMUNITY SCHOOL INC. | ) |
| 5901 West Chester Park Dr. | ) |
| College Park, Prince George's Cty, MD  20740 | ) |
| | ) |
| Serve its resident agent: | ) |
| Neal Brown | ) |
| 5901 West Chester Park Dr. | ) |
| College Park, MD 20740 | ) |
| | )   Civil Case No. _____ |
| And | ) |
| | )   JURY TRIAL DEMANDED |
| ADELPHI FRIENDS MEETING INC. | ) |
| 2303 Metzerott Road | ) |
| Adelphi, Prince George's Cty,  Md. 20783 | ) |
| | ) |
| Serve its resident agent: | ) |
| Victor Thuronyi | ) |
| 2303 Metzerott Road | ) |
| Prince George's County | ) |
| Adelphi, MD 20783 | ) |
| | ) |
| And | ) |
| | ) |
| BALTIMORE YEARLY MEETING | ) |
| OF THE RELIGIOUS SOCIETY OF | ) |
| FRIENDS, INC. | ) |
| 17100 Quaker Lane | ) |
| Sandy Spring, Montgomery Cty, Maryland 20860 | ) |
| | ) |
| Serve its resident agent: | ) |
| Natalie Finegar | ) |
| 217 North Charles Street | ) |
| Third Floor | ) |
| Baltimore, Maryland 21201 | ) |

And )
                                           )
ESTATE OF )
FERNANDO ASTURIZAGA )
Personal Representative: )
Luz Lillian Perez Viscarra )
3202 19th St N.W. )
Washington D.C. 20010 )
  )
Serve its resident agent: )
Glenn Osbourne )
503 Avirett Ave., )
Cumberland, Alleghany Cty, Md. 21502 )
  )
And )
  )
THOMAS H. GOSS )
143 Casmir Drive )
Historic New Castle, DE 19720 )
  )
And )
  )
MARCIA E. O'NEIL-WHITE )
65 Brantwood Rd. )
Buffalo, NY 14226 )
  )
THE ESTATE OF JANE L. MANRING )
Serve: Estate Executrix: )
Laura Manring Samardick )
3 Nottingham Circle )
Princeton, NJ  08540 )
  )
And )
  )
JUDITH A. SMITH )
a/k/a Judy Smith )
4710 Cumberland St., Apt. 206 )
Saint Paul, MN 55126 )
  )
                         Defendants. )

## COMPLAINT
(Sexual Abuse of a Minor)

-----------------------------------------------------------------------------------------------------

Plaintiff, Jane Doe[1] ("Plaintiff") by and through her attorneys, brings this action against Defendants, Friends Community School Inc. ("FCS"); Adelphi Friends Meeting Inc. ("AFM"); Baltimore Yearly Meeting of the Religious Society of Friends Inc. ("BYM"); The Estate of Fernando Asturizaga ("Asturizaga"); Thomas H. Goss ("Goss"); Marcia E. O'Neil-White ("O'Neil-White"); The Estate of Jane L. Manring ("Manring"); and Judith A. Smith ("Smith") and alleges that:

## PARTIES

1.      This is an action to recover damages for the sexual abuse and other related wrongs suffered by Plaintiff beginning when she was 8 years old and continuing until she turned 18 on December 8, 2002.

2.      Plaintiff is a resident of Florida.  She was born on December ▉ 1984.

3.      Plaintiff was a student at AFM t/a FCS from September of 1991 until June of 1997 (grades 1 - 6).  She was also a summer camp attendee every summer at AFM t/a FCS and FCS (after June of 1998) from 1995 through 2002 (grades 1-12).  She was also an FCS summer camp counselor in training every summer from 2000 through 2002. She was also an after-school volunteer at AFM t/a FCS and then FCS from 1996 through 2002. (grades 7 - 12).

4.      Defendant, AFM is a Monthly Quaker meeting within the Baltimore Yearly Meeting.  AFM is, and at all times was, located in Adelphi, Maryland.

5.      Defendant, FCS was founded by members of the AFM in 1986.  FCS is, and at all times was, located in Prince George's County, Maryland.

---

[1] / Following service, Plaintiff will file a motion to proceed as a pseudonym in order to protect Plaintiff's privacy. The other minor sex abuse victims and their families identified in the Complaint are referenced by initials in order to protect their privacy as well.

6.     From 1986 to June 15, 1998, FCS was wholly owned, operated and controlled by AFM and its members and board of directors.  One June 15, 1998, FCS incorporated separately from AFM but remained under the control of AFM and its members thereafter at all times through December ▉ 2002 since FCS's Board continued to contain an overwhelming majority of AFM members, along with members of other Friends meetings such as Bethesda Friends Meeting and Sandy Spring Friends Meeting.

7.     After June 15, 1998, AFM continued to appoint all members of FCS's Board of Directors who directly hired the FCS head of school.   Moreover, at all relevant times, AFM continued to maintain a "school committee" for the purpose of assisting, supporting, and directing FCS in a number of different ways, including fundraising, event planning, religious education, and hiring/rehiring decisions.

8.     In fact, at all relevant times through 2002 and likely thereafter, the annual hiring and rehiring of all FCS teachers, including Asturizaga, was conducted jointly through the AFM school committee, the FCS Board, and the AFM/FCS heads of school. For instance, all signed offers made to Asturizaga and presumably all other FCS employees from June of 1998 through 2001 contained language indicating that 'the school committee makes this offer with the following understanding [describing the terms of employment]". "School committee" was referring to the AFM school committee.

9.     At all times between June 15, 1992 and June 15, 1998, Asturizaga worked at AFM t/a FCS as an employee, teacher, summer camp director, and after-school program director.  During that same time period, he was frequently a driver and chaperone on AFM t/a FCS school and summer camp trips.

10.     At all times between June 15, 1998 and December 7, 2002, Asturizaga was an FCS employee, teacher, summer camp director, and after school program director. During that same time period, he was frequently a driver and chaperone on FCS school and summer camp trips.

11.     At all times prior to June 15, 1998, FCS was actually AFM t/a FCS since there was no separate legal entity known as FCS.  In fact, when Asturizaga applied to work at FCS in late 1991, he actually applied to AFM t/a FCS according to his application for employment.

12.     FCS has operated a Kindergarten through grade 6 progressive Quaker day school and summer camp in Prince George's County, Maryland at all times since 1986. In approximately 2005, FCS added grades 7 and 8.

13.     Initially, AFM t/a FCS operated on the grounds of the AFM in Adelphi, Prince George's County, Maryland until moving  to the old Regina High School location on Riggs Rd in Adelphi, Md.

14.     Then, in the summer of 1991, AFM t/a FCS moved FCS to another location on Calvert Rd in College Park, Md.

15.     FCS moved into its present location on Westchester Park Drive in College Park, Maryland in 2007.

16.     Defendant, BYM is a Maryland corporation with its principal office located at all times from September 1993 through December of 2002, on the campus of Sandy Spring Meetinghouse in Sandy Spring, Montgomery County, Maryland.

17.     BYM was first incorporated in Maryland in 1968.  Prior to 1996, its corporate name was Baltimore Yearly Meeting of the Religious Society of Friends.  On

3

September 5, 1996, BYM changed its name to add an "Inc." to the end.  BYM is the parent

organization for all monthly Quaker meetinghouses in its region which extends (according

to the BYM website) from "central Pennsylvania, Maryland, parts of West Virginia,

Virginia, and the District of Columbia."

18.    At all times from 1992-2002, BYM's then general secretary, Frank Massey,

lived on the grounds of the Sandy Spring Meetinghouse as well.  From 1999 to 2002, one

of his neighbors was FCS head of school, Goss.

19.    Defendant, Goss was the headmaster of FCS from at least June 1, 1999 until

the FCS board terminated his employment in 2007.

20.    Defendant, O'Neil - White was the head of school at FCS from January 1,

1999 through June 15, 1999.

21.    Defendant, Estate of Fernando Asturizaga is a Maryland estate established

in the Orphans Court for Allegany County, Md. (Estate No. 36400) for Asturizaga who

died in the Western Maryland Penitentiary in Cumberland, Md. on April 12, 2018.

22.    At all relevant times and for years prior, Defendants AFM, FCS, Manring,

Smith, Goss and O'Neil-White let the AFM and FCS community know in numerous direct

and indirect ways that Asturizaga was an extremely  trusted and highly valued member of

the AFM and FCS community, despite the fact that:

      a.    no one at BYM, AFM or FCS had ever done a background

      check on Asturizaga at the time he was hired or at any time thereafter;

      b.    Asturizaga was openly and publicly (as well as privately)

      interacting, both physically and verbally, with young FCS female students

in numerous inappropriate and highly sexualized ways from 1993 until he was terminated in 2003;

      c.     no one at BYM, AFM or FCS (after June 15, 1998) had ever investigated numerous allegations and observations of inappropriate contact between Asturizaga and  Plaintiff as well as other young girls at AFM/FCS and then FCS (after June 15, 1998) at any time before December 7, 2002.

23.    Defendant, the Estate of Jane L. Manring is a Massachusetts estate established in the Commonwealth of Massachusetts Probate and Family Court, Worcester County (Docket No. W011P3627EA) for Jane L. Manring who died in Athol, Massachusetts on 09/05/2011. Laura Manring Samardick was decreed Executrix of the estate under Massachusetts law on 1/27/2012. Ms. Manring was the head of school of AFM/FCS from 1986 to June, 1996.

24.    Defendant, Judy Smith is a resident of Minnesota.  Ms. Smith was the head of school of AFM/FCS from June of 1996 to January 1, 1999.

25.    Counsel for Defendants (except Asturizaga) received an unredacted draft of this Complaint on September 22, 2023, naming Plaintiff and the various minor victims alleged herein and their families (who are identified for purposes of this public document only by initials).

26.    Counsel for Defendants also had the opportunity to interview Plaintiff in Tampa, Florida on September 12, 2023 and know who she is as well as the various minor individuals and their families identified by initials herein.

## JURISDICTION AND VENUE

27.     Plaintiff is a citizen of Florida for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

28.     The Friends Defendants (BYM, AFM, and FCS) are headquartered and incorporated in Maryland for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

29.     Defendant Goss is a citizen of Delaware for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

30.     Defendant O'Neil-White is a citizen of New York for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

31.     Defendant, the Estate of Fernando Asturizaga is a citizen of Maryland  for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

32.     Defendant, the Estate of Jane Manring is a citizen of Massachusetts for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

33.     Defendant, Judy Smith is a citizen of Minnesota  for purposes of diversity jurisdiction under 28 U.S.C. § 1332.

34.     This Court has original subject matter jurisdiction with respect to this action pursuant to 28 U.S.C. § 1332 as there exists complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), exclusive of interest and costs.

35.     Moreover, this Court also has federal question subject matter jurisdiction over Plaintiff's Title IX claim asserted in Count VIII.  It has supplemental jurisdiction over the remaining state law claims.

36.     Defendants are subject to personal jurisdiction in this Court pursuant to Md. Courts and Judicial Proceedings Article  §6-102 and §6-103  and to the fullest extent allowed under the United States Constitution in that this cause of action arises out of Defendants' individual and collective actions and inactions, directly and through their agents, by transacting business in Maryland and causing  tortious injury by an act or omission in Maryland and causing tortious injury in Maryland by an act or omission outside of Maryland.

## OVERVIEW

37.     Between January 1, 1993 and December █ 2002, Asturizaga inappropriately touched and then sexually abused Plaintiff on no less than 50 occasions by touching/grabbing her buttocks, upper thighs, chest/breasts, anus and vagina, including at least 3 times where Asturizaga digitally penetrated Plaintiff's vagina (including once causing vaginal bleeding) and dozens of times when Asturizaga thrust his penis, sometimes erect, into Plaintiff from the front and behind while he held her tightly so she couldn't escape.   During this time, he also repeatedly showed her pornography and repeatedly let her know that he wished to have sexual intercourse with her.

38.     On many occasions between January 1, 1993 and December █ 2002, Asturizaga's inappropriate behavior toward Plaintiff and other minor female AFM/FCS students was public, in full view of other AFM/FCS teachers and parents.

39.     On other occasions during the same time period, Asturizaga's inappropriate behavior toward Plaintiff was private, where Plaintiff and Asturizaga were alone in various cars, rooms and other locations on and off the FCS campus.   However, even in some of these private instances, Plaintiff or others told various AFM/FCS teachers, heads of school

(including Manring, Smith, Goss and O'Neil-White) and board members of Asturizaga's inappropriate and possibly sexually abusive behavior toward Plaintiff and/or other young female AFM/FCS students.

40. Defendants Manring, Smith, O'Neil-White and Goss had actual knowledge of Asturizaga's inappropriate and possibly sexually abusive behavior toward Plaintiff and/or other young female AFM/FCS during the time each was FCS head of school, and, in Goss' case, no later than the summer of 1999.

41. Despite actual knowledge of Asturizaga's inappropriate and possibly sexually abusive behavior toward Plaintiff and other young female AFM/FCS students, none of the Defendants and the boards thereof did anything to investigate much less stop Asturizaga's abuse of Plaintiff at any time before she turned 18 on December █ 2002.

42. As a result of Asturizaga's long term abuse, Plaintiff experienced tremendous physical and mental pain and suffering including an attempt to die by suicide in September of 2000 when she was 15 years old.

43. She has suffered and will suffer a loss of income, medical expenses and severe emotional distress and pain and suffering as a result of the abuse alleged herein.

## **FACTUAL BACKGROUND**

44. Asturizaga began "grooming" Plaintiff in 3rd grade in 1993 when he was her Spanish teacher at AFM/FCS. Plaintiff was 8 at the time.

45. Asturizaga claimed on his 1991 application to AFM/FCS that he was born in 1966. If true, he was 27 years old in 1993.

46. "Grooming" is a classic behavioral pattern of sexual predators that often predates more serious sexual abuse.

8

47.     According to the United States Department of Justice National Sex Offender Program:

> Grooming is a form of child sexual abuse that can involve the targeting and
>
> isolation of the victim, in order to gain the trust of the victim through a controlling
>
> relationship to manipulate, exploit, and abuse the victim.

https://www.justice.gov/usao-cdca/programs/project-safe-childhood-psc#:~:text=Grooming%20is%20a%20form%20of,exploit%2C%20and%20abuse%20the%20victim.

48.     Consistent with the classic "grooming" pattern, Asturizaga  frequently failed to respect normal teacher/student boundaries, and, for instance, repeatedly engaged in inappropriate and public acts of verbal and physical affection toward Plaintiff and other FCS minor girls from 1993 until Goss terminated Asturizaga's employment at FCS in 2003.

49.     For instance, during this time period, Asturizaga frequently grabbed young female FCS students such as Plaintiff and held them on his lap while he tickled them, blew into the back of their necks, nibbled their ears, fondled them all over their bodies, including their butt and chest.  Asturizaga "groomed" and sexually abused Plaintiff frequently from 1993-1996.  He also bought Plaintiff meals and gifts.

50.     In 1996, Plaintiff chose Asturizaga to be her mentor on a school research project. He had been her Spanish teacher, P.E. teacher, and soccer coach for a number of years.  These activities brought them in frequent contact.  Asturizaga's verbal and physical sexual abuse of Plaintiff ramped up thereafter.

51.      Beginning in 1995, as Plaintiff began going through puberty, Asturizaga would comment frequently on inappropriate subjects such as Plaintiff's training bra, her

9

developing body, puberty, her physical appearance, whether she wanted to kiss the boys, etc.  He also ramped up his physical abuse of Plaintiff with even more inappropriate touching, tickling, hugging, holding Plaintiff tightly and preventing her from moving, pulling her onto his lap, brushing up against her breasts and butt, grinding his crotch into her from front and behind, etc.

52.     During this time, Asturizaga also ramped up his grooming of the Plaintiff. For instance, he continued buying her meals and gifts.  He also offered her beer and cigarettes, took her to get her nails done and promised not to tell her parents that she got her belly button pierced (after demanding to see her belly button piercing).  All of these activities occurred or began on FCS property during school or summer camp hours.

53.     Thereafter, Asturizaga eventually moved on to even more sexualized advances such as kissing, fondling, massaging, grabbing Plaintiff's breasts and butt, pushing his hand inside her pants and shirt to her crotch, breasts and butt, showing her pornography, discussing sex and birth control, showing Plaintiff condoms, and similarly abusive behavior. During this time period, he made it abundantly clear to Plaintiff that he wanted to have sexual intercourse with her.  It was a very confusing and extremely stressful time for Plaintiff, as it would be for any young girl.

54.     From 1993 to December ▮ 2002, Asturizaga's abuse of Plaintiff occurred at FCS and elsewhere inside and outside of Maryland including BYM's Camp Catoctin, Md., an FCS camp trip to the National Zoo, an FCS camp trip to the National Folk Life Festival on the National Mall, during various trips to the store, at various local pools, a 3rd grade class trip to Virginia, a 5th grade class trip to NYC (which included a side trip to

the Princeton Friends School in Princeton, New Jersey – where the abuse also occurred), and other FCS trips to Mt Vernon, Virginia, Alexandria, Virginia and other locations.

55.     In the fall of 1997, Plaintiff began attending Thornton Middle School for 7th and 8th grade because FCS did not have a 7th and 8th grade at the time.  However, from 1997 to 2002, Plaintiff continued attending the FCS summer camp.  She also volunteered at FCS after school in FCS's after school care program.  Asturizaga was head of the FCS summer camp during that time and also ran the after-school care program.  His sexual abuse of Plaintiff continued.

56.     During the period from 1996 to 2002, Plaintiff was going through tough times with her parents who were often fighting with each other and Plaintiff.  They eventually divorced.  Meanwhile, Asturizaga was also grooming, sexually abusing and eventually raping and sodomizing another FCS minor student, HT, beginning when HT was 10 years old. HT was born in February of 1988.

57.     At the same time, Asturizaga was also having sexual relations with a number of other FCS teachers including Suzanne Halling and Susie Baker-Lapp, as well as engaging in numerous public and private inappropriate encounters with multiple AFM and FCS minor female students.

58.     In the spring of 1996, Carol Kagan, a former employee at AFM/FCS witnessed Asturizaga repeatedly taking a young child into a room alone.  The room had no windows to the hallway.  Ms. Kagan complained first to Asturizaga and thereafter, to the then AFM/FCS head of school, Jane Manring in an attempt to stop this unacceptable behavior.  Asturizaga did not stop.  Moreover, there was no evidence that Ms. Manring even talked to Asturizaga much less disciplined him in any way. In fact, Carol Kagan

testified under oath in the HT case that, "I don't think she [Jane Manring] was terribly concerned about it."

59.     Ms. Manring's son was later convicted of filming his sexual abuse of 5-year-old children in Japan from 1996 - 1999.  Ms. Manring's son's sexual issues may have influenced her hands-off approach toward Asturizaga's open and obvious inappropriate behavior toward Plaintiff and other minor AFM/FCS female students during her tenure as head of school at AFM t/a FCS.

60.     In June of 1996, Judy Smith replaced Jane Manring as head of school. Judy Smith was the head of school at AFM t/a FCS from June 1996 until January 1999. During her tenure, Ms. Smith continued the hands-off approach towards Asturizaga's inappropriate behavior toward Plaintiff and other minor female AFM/FCS students that had marked Ms. Manring's tenure, despite the fact that Asturizaga continued to engage openly and publicly in inappropriate and highly sexualized behavior with Plaintiff and other minor female students.

61.     During her tenure, Ms. Smith failed to investigate or address Asturizaga's highly inappropriate sexualized interactions with Plaintiff and other minor female AFM/FCS students despite her actual knowledge of and personal observation thereof.

62.     In January of 1999, Ms. Smith was fired by the FCS board.  She was replaced by Defendant O'Neil-White, a former AFM/FCS teacher, who previously had moved to Buffalo, NY and had agreed to serve on an interim basis pending the hiring of a new permanent head of school.

63.     In the summer of 1999, FCS and O'Neil-White expelled HT and her little brother because AT, HT's mom, had made multiple vociferous oral complaints, then a

June 9, 1999 written complaint, of an inappropriate relationship between HT and Asturizaga.

64.     Before expelling HT and her brother, Ms. O'Neil-White informed the FCS school board and the AFM clerk of AT's complaints.

65.     Upon information and belief, O'Neil-White's report of AT's complaints were also forwarded to one or more members and officers of BYM.

66.     In a June 11, 1999 response to AT's June 9, 1999 letter and previous oral complaints, FCS's then head of school, Marcia O'Neil-White wrote, "Fernando is a warm and helpful caregiver to HT, as he is to every other student with whom he has contact at FCS.  There has never been a hint of inappropriate behavior on his part. . . We at the school know [your] allegations to be unfounded and untrue."

67.     None of the Defendants ever investigated AT's allegations prior to making the bald assertion that "we . . .know your allegations to be unfounded and untrue." O'Neil-White copied her June 11, 1999 response letter to the clerk of the AFM and Asturizaga.

68.     None of the Defendants ever questioned HT directly about the allegations made by her mom to FCS and O'Neil-White.  Upon information and belief, none of the Defendants ever questioned Asturizaga about the allegations during the relevant time period.   A perfunctory search of Asturizaga's FCS-provided cell phone records would have revealed that he was calling and receiving numerous calls to/from HT during this time period and continuing.

69.     In 2010, a jury in the Circuit Court of Maryland for Montgomery County rejected Ms. O'Neil-White's assertion that Fernando was a "warm and helpful caregiver"

13

and found Asturizaga guilty of 18 counts of raping and/or sexually abusing HT in Montgomery County when she was a minor.  As a result, the court sentenced him to over 168 years in prison.  His conviction was upheld on appeal:  *Fernando Asturizaga v. State of Maryland,* No 1341 Md. App. Sept term 2012, (Aug. 21, 2015)(unreported).

70.      Notably, FCS failed to provide a copy of AT's June 9, 1999 letter and Ms. O'Neil-White's June 11, 1999 response to the police or state's attorney in either a 2003 sex abuse of a minor (AB) criminal prosecution against Asturizaga in Prince George's County, Maryland (where Asturizaga was found not guilty) or a 2010 sex abuse of a minor (HT) criminal prosecution of Asturizaga in Montgomery County, Maryland (where Asturizaga was found to have sexually abuse HT on at least 18 occasions in Montgomery County between 1999 and 2001).

71.      Shortly after writing the June 11, 1999 letter, Ms. O'Neil-White left FCS and was replaced by Goss as FCS head of school.

72.      From June of 1999 through December █ 2002, Goss also breached his duty to protect Plaintiff and the other FCS students from Asturizaga despite his actual knowledge and personal observation of Asturizaga's highly inappropriate sexualized interactions with Plaintiff, HT and other minor female AFM/FCS students as well as his personal knowledge of HT's mom's allegations against Asturizaga.

73.      During his tenure, Goss was having an affair with Susie Baker-Lapp, an AFM/FCS teacher with whom Asturizaga was also having an affair.  In fact, FCS school secretary, Gwen Mathews testified in the HT case that she walked into Marcy Seitel's classroom before school one day and found Asturizaga and Ms. Baker-Lapp spooning on

14

the couch in an intimate embrace.  Despite knowledge of this event, neither Goss nor anyone else at FCS took any disciplinary action against either teacher.

74.     Another former FCS employee tells a similar story, but indicates that Marcy Seitel caught Asturizaga and Ms. Baker-Lapp having sex on the couch in her classroom.

75.     In response, Ms. Seitel complained to Goss (which caused friction between Ms. Seitel and Ms. Baker-Lapp/Asturizaga).  Goss did nothing (which caused friction between Goss and Ms. Seitel).  Thereafter, Ms. Seitel left FCS (but continued to be an active member at AFM and eventually head of school at Thornton Friends School).

76.     Thereafter, Goss promoted Ms. Baker-Lapp to the No 2 position in the school leadership as assistant head of school. Both Ms. Baker-Lapp and Goss were married at the time and were trying to hide their various affairs from their spouses.

77.     Asturizaga knew that Ms. Baker-Lapp and Goss were also having an affair with each other, a fact that kept Goss and Ms. Baker-Lapp from aggressively acting on the many warning signs regarding Asturizaga's recurring inappropriate behavior with HT, Plaintiff and other FCS students.

78.     Ms. Baker-Lapp also knew that HT and other FCS students were sleeping at Asturizaga's one-bedroom apartment in 1998-1999 but took no action to stop Asturizaga's inappropriate behavior.

79.     Ms. Baker-Lapp and other FCS employees were also aware of many other warning signs such as seeing Plaintiff, HT, and other FCS students sitting on Asturizaga's lap; seeing Asturizaga leave FCS alone with Plaintiff, HT, and other young

15

students; seeing Asturizaga take Plaintiff, HT and other young students into rooms by themselves, and other incidents.

80.     Asturizaga's inappropriate behavior toward minor students was common knowledge and discussed frequently amongst the FCS faculty.  Yet not one FCS head of school, teacher, employee, or trustee ever took any action to stop Asturizaga or report his inappropriate behavior to the authorities during the time that Plaintiff was a minor.

81.     At her deposition in the HT case, former FCS teacher, Elizabeth Hole told the story of another young girl in her class who was so uncomfortable around Asturizaga that Ms. Hole walked the girl to and from her Spanish class with Asturizaga.  However, Ms. Hole claimed to have never asked the little girl or her parents why she felt so uncomfortable around Asturizaga. Moreover, Ms. Hole claimed that she never reported the little girl's fears to Goss or anyone else at AFM/FCS.

82.     At her deposition in the HT case, Ms. Hole admitted that she previously indicated that Amy Robertson, an FCS mom, told her that Asturizaga fondled the little girl in a stairwell at FCS.  Amy Robertson has since passed away, but her daughter, Tory Johnson, was a student at FCS at the time.  Ms. Johnson confirmed that the little girl told her that Asturizaga fondled her in the stairwell.  Ms. Johnson told her mom.  Her Mom told Elizabeth Hole.  Ms. Hole claimed that she was the assistant head of school at FCS at the time.

83.     Elizabeth Hole testified in the HT matter that "since Fernando seemed to have plenty of sexual opportunities going on [with FCS teachers], one didn't stop and look for anything more, because there seemed to be plenty of opportunities."  When asked what she meant by that, Ms. Hole continued, "he was having a relationship with

16

Suzanne [Halling], the Art teacher and with Susie [Baker-Lapp], I naively thought that was probably enough." Ms. Hole testified that Sue Ellen Ferguson, an FCS school board trustee told her, "Usually when there is plenty else going on [i.e. Asturizaga's multiple affairs with FCS teachers], you know, there isn't the need for pedophilia."

84.     Meanwhile, many FCS teachers and staff ignored the numerous warning signs that should have led any reasonable person to investigate and put a stop to Asturizaga's behavior.  For instance, Gwen Mathews, the FCS school secretary saw Asturizaga and Plaintiff leaving FCS alone on multiple occasions in the late 1990s and early 2000s (before December ▇ 2002).  She also saw Asturizaga meet HT alone in classrooms with the door closed.  She also said that Plaintiff told her that Asturizaga asked Plaintiff if she was on birth control pills.  Crystal Martin, the FCS business manager was also present at these and other similar discussions where Plaintiff told Ms. Mathews and Ms. Martin of Asturizaga's inappropriate sexualized behavior toward, and sexualized discussions with Plaintiff.

85.     In the summer of 2000, Asturizaga gave Plaintiff his FCS emergency cell phone which was on the FCS cell phone plan. The purpose of the phone was so that Asturizaga could communicate with FCS parents in case of an emergency concerning their child in relation to the summer camp or after-school programs. At the time, FCS knew that Asturizaga also had his own cell phone and knew his personal cell number.

86.     Thereafter, Asturizaga frequently used his own cell phone to talk to Plaintiff on the FCS emergency phone. The calls between Asturizaga and Plaintiff became so numerous and ate up so many minutes that Crystal Martin, head of FCS' business office, complained to Asturizaga about FCS' large cell phone bills from the FCS

17

emergency phone.  However, neither Ms. Martin nor anyone else at FCS questioned why there were so many calls between Asturizaga's personal cell phone and the FCS emergency cell phone that he had provided to Plaintiff.   Plaintiff was 15 at the time. Thereafter, Asturizaga bought Plaintiff another phone and added her to his private cell phone plan.  The abuse continued.

87.     Ellen Iscoe, an FCS parent, says she complained to Goss first verbally and then in writing about an incident involving her young daughter Dana and Asturizaga in 2000 or 2001.  She said her daughter came home from school one day shaking and crying.  When Ms. Iscoe questioned why, her daughter told her that Asturizaga  "creeped me out" with the things he said, the way he looked at her, and the way he made her feel.

88.     Ms. Iscoe's 2000 or 2001 letter to Goss was not produced to the State's Attorney for Prince George's County in Asturizaga's 2003 criminal case arising out of the AB incident or the 2010 sex abuse of a minor criminal prosecution of Asturizaga in Montgomery County, Maryland arising out of his long-time abuse and rape of HT. Nor did it spur an investigation by Goss or anyone else at FCS.

89.     On an FCS class trip to BYM's Camp Catoctin, Md., in early 2000s (prior to December 7, 2002),  an FCS mom witnessed Asturizaga invite FCS young female students up to a loft to "play with him" where parents could not see him, or the girls involved. Despite the fact that this event was open and obvious, none of FCS's teachers or BYM personnel present did anything to stop what the FCS mom deemed, "inappropriate at best."

90.     In short, none of these numerous red flags were ever investigated by FCS, AFM or BYM or their various employees, officers, heads of school, and board of trustees.

91.     Moreover, BYM failed to properly supervise youth trips to its various camps, including Catoctin, or to train supervisory adults who BYM authorized to be on its camp premises in the proper procedures and protections necessary to protect campers such as Plaintiff from sexual abuse or to take reasonable security measures to protect minor campers such as Plaintiff from sexual abuse on BYM property, such as requiring the presence of trained BYM supervisory personnel on site during events involving minors such as Plaintiff.

92.     Moreover, at no time prior to December █ 2002, did any employee, agent, or representative of AFM/FCS or (after June 1998) FCS or BYM ever report any instance of suspected inappropriate contact by Asturizaga to the proper authorities or take any action to stop Asturizaga's inappropriate behavior with minor female FCS students, or his sexual abuse of Plaintiff, HT, and other young AFM/FCS students.

93.     BYM has owned and operated a number of quaker youth camps throughout its area, including Camp Catoctin in Maryland.  In every year since 1993, BYM has operated the camps as one of its main source of annual revenue.

94.     From 1998-1999, AFM member Michele Levasseur was an employee of BYM.  Her duties as BYM "Youth secretary" included being in charge of overseeing all BYM youth programs throughout BYM.  She personally knew of 2 incidents of adults acting in a sexually inappropriate manner with youth within the BYM prior to 1999,

including one who scared a child when the adult aggressively hugged a child but failed to let the child go.

95.     In May 2000, HT's mother, AT disappeared shortly after she informed Asturizaga that she planned to go to the police with her suspicions that he was abusing HT.  Her body was never found. She was declared legally dead by order of the Court on March 27, 2001.  In April of 2018, the Montgomery County Police Department declared that Asturizaga was a person of interest in the murder of AT based on newly discovered evidence. Later that night, Asturizaga was found dead in his cell of an apparent suicide.

96.     In the summer of 2000, following the disappearance of her mom, HT worked as a counselor in training at the FCS summer camp at FCS where Asturizaga was camp director.  Plaintiff also attended the FCS summer camp as a counselor in training.

97.     Also in the summer of 2000, AT's sister, ST met with Goss and reminded him of AT's wishes that Asturizaga not have any private contact with HT given AT's prior concerns of an inappropriate relationship between HT and Asturizaga and ST's present concerns of an inappropriate relationship.

98.     Previous to the meeting with Goss, ST had dropped by the camp unannounced to pick up HT and was unable to locate her in the school. After walking through what appeared to be an empty school, ST saw  Asturizaga and HT coming out of a darkened room with no window. ST did not confront HT or Asturizaga with what she thought was a very strange incident. However, ST did stress to Goss the importance of keeping HT and Asturizaga from being alone together in private. Goss got angry with ST and screamed at her to get out of his office. ST thought his response so unhinged and bizarre that she feared for her own safety and left.

99.    In short, none of these numerous red flags were ever investigated by FCS, AFM, or BYM, or their various employees, officers, heads of school, and board of trustees.

100.    In 2003, FCS fired Asturizaga after an 8-year-old FCS student (AB) complained that he had tickled her, put his hand inside her pants, and guided her hand toward his penis when she was sitting either next to him or on his lap during a movie.  It was parent-teacher night and Asturizaga was put in charge of a roomful of children while the parents and teachers met in another room.  After criminal charges were brought against Asturizaga, Suzanne Halling approached AB on the FCS playground and warned her to stop lying about Asturizaga.  Meanwhile, Susie Baker-Lapp, Sarah Howard, and other FCS staff and school board trustees held a support meeting for Asturizaga at AFM. No similar support was shown for AB or her family, either prior to, at or following the trial.

101.    In fact, following a widespread and public show of support for Asturizaga at trial - and supporting testimony from Goss and Susie Baker-Lapp - a jury found Asturizaga not guilty of the AB sexual abuse charge. Nonetheless, Goss fired him from FCS, after consultation with the FCS board.  At that time, Goss told Asturizaga that AB was the 5th FCS female minor student to allege that Asturizaga engaged in inappropriate sexual behavior toward her.

102.    Goss' testimony at Asturizaga's criminal trial was yet another example of FCS's widespread failure to protect children at FCS. Goss testified untruthfully that Asturizaga's interactions with students had been "very appropriate" and told the jury, "I

trust him." He also acknowledged the school's duty to report allegations of sexual abuse to Social Services, whether he and the FCS leadership believed the allegations or not.

103.    However, Goss failed to tell the jury about at least 4 other young girls and numerous parents, teachers and FCS employees who had accused Asturizaga of a wide range of inappropriate behavior with children, going back years. He also failed to tell the jury or the prosecutor that he was having an affair with Susie Baker-Lapp, the same woman with whom Asturizaga was also having an affair. He also failed to tell the jury that he initially told Alex Bean's mom that he wished to handle her complaint about Asturizaga internally rather than report it to the police.

104.    Likewise, Susie Baker-Lapp testified on Asturizaga's behalf at the criminal trial. She swore to Asturizaga's good character and her opinion that he was a law-abiding citizen. Baker-Lapp failed to mention that she was having an affair with Goss and Asturizaga and that she did not want Asturizaga near her own daughters, Hannah Lapp and Alyssa Lapp.

105.    Shortly after his 2003 criminal trial and discharge from FCS, Asturizaga was hired at Thornton Friends School, another Quaker school within the BYM. Thornton Friends School was closely affiliated with Sandy Spring Friends Meetinghouse.

106.    Ms. Hole testified in HT's case that she provided a reference to Thornton Friends School on Asturizaga's behalf.

107.    Mr. Norman Maynard was the headmaster at Thornton Friends School who hired Asturizaga. He spoke to Goss before hiring Asturizaga. Mr. Maynard, his former wife, Kathy Selvaggio, and her daughter, Giovanna, were aware of AB's

allegations of sexual abuse against Asturizaga prior to Mr. Maynard hiring Asturizaga.
Ms. Selvaggio's daughter was a student at FCS.  Asturizaga had been her teacher.

108.    According to Ms. Selvaggio, after Asturizaga began teaching at Thornton,
"Norman Maynard, head of Thornton Friends at the time, express[ed] some concerns
about Fernando's sense of boundaries with the students [at Thornton]. . ."

109.    In 2000 or 2001, Plaintiff had told her mom that Asturizaga made her feel
extremely uncomfortable and had acted inappropriately around Plaintiff, without giving
details of her many inappropriate encounters with Asturizaga.

110.    Plaintiff's mom called an FCS parent named Amy Robertson who was a
licensed social worker. Ms. Robertson talked to Plaintiff about Asturizaga's inappropriate
behavior toward Plaintiff and strategies to deal with Asturizaga going forward.

111.    Upon information and belief, at some point in 2000 or 2001, Ms.
Robertson also reported what Plaintiff told her to Goss.

112.    Nonetheless, Asturizaga was not disciplined or counseled, much less fired
at any time, until Goss and the FCS board finally terminated his employment at FCS in
2003 following the AB incident.

113.    After his firing at FCS, Asturizaga told Plaintiff that Goss had told him
that he was being fired because of the AB incident and complaints concerning
Asturizaga's inappropriate sexualized behavior around 5 young girls dating back to 1999.

114.    Asturizaga later told Plaintiff that she was one of the 5 girls.  Plaintiff later
found out that Ms. Robertson had complained to Goss about Asturizaga's aggressively
sexualized behavior around Plaintiff and the young girl who Asturizaga had fondled in
the FCS stairwell.

115.    Goss had other actual notice of Asturizaga's inappropriate conduct around minor FCS female students:

116.    Prior to 2000, two other FCS Moms (not AT) complained to Goss of Asturizaga's inappropriate behavior toward children, especially HT whom they witnessed sitting on Asturizaga's lap at recess. Both Moms put their complaints about Asturizaga to Goss in writing.

117.    During the 2010 criminal proceedings in Montgomery County, Maryland, neither of those letters, nor the 1999 letter written by AT to O'Neil-White, were produced by FCS to the States Attorney for Montgomery County.  At least one of the Moms wrote to Goss more than once to complain of Asturizaga's inappropriate behavior towards children.  The Montgomery County police obtained a copy of AT's 1999 letter to O'Neil-White from AT's sister, ST, but not from FCS.

118.    Moreover, over the course of years on multiple occasions between 1999 and 2001, various FCS employees including Gwen Mathews witnessed inappropriate behavior between Asturizaga and HT such as HT being alone in Asturizaga's classroom for long periods of time  – with the door closed and no window to the outside hall and reported their concerns to Goss.

119.    Despite repeated concerns expressed by various parents and FCS employees about Asturizaga's inappropriate behavior as set forth herein, none of the Defendants ever told Plaintiff or her parents at any time prior to December 7, 2002, of the many other expressions of concern by FCS parents and FCS employees concerning Asturizaga's "creepy" and "inappropriate" behavior toward HT and other children.

120.     Nor did any Defendant ever do even a cursory investigation of the concerns expressed by numerous FCS parents and witnessed by multiple FCS teachers, heads of school, and AFM/FCS staff, such as speaking to HT or Plaintiff.  During the relevant time period, Asturizaga was talking to HT and Plaintiff on his cell phone on a regular basis, both receiving calls from them at FCS and calling them to discuss, among other things, when they would next get together to engage in sexual activity.

121.     During that period Asturizaga repeatedly raped, sexually abused, and sodomized HT both on FCS school property, and in multiple locations in Prince George's County and Montgomery County, Maryland as well as outside Maryland including an FCS school trip to Virginia.

122.     Defendants,  FCS, AFM, and BYM, their agents, employees, officers, board members, and trustees, including  Goss and O'Neil-White failed to adequately protect Plaintiff; failed to report the suspicions of Asturizaga's child abuse of Plaintiff, HT, and other minor girls to the authorities (as required by Maryland law); failed to do any background check on Asturizaga prior to hiring him; failed to properly monitor, supervise and investigate Asturizaga's inappropriate behavior activities with Plaintiff, HT and other children: failed to terminate Asturizaga at FCS despite their authority to do so: failed to warn Plaintiff and her parents of the numerous other complaints against Asturizaga: failed to properly train their employees and officers regarding appropriate and inappropriate interactions with minor female students, or when and how to report suspected abuse: and otherwise failed to take reasonable and necessary measures to protect Plaintiff from sexual abuse at the hands of Asturizaga, an FCS employee.

123.   Instead, FCS and its various Defendant heads of school, ignored warning sign after warning sign and even expelled HT and her brother from the school at the end of the spring, 1999 school year.

124.   FCS and Goss' failure to investigate any reports of potential abuse, was also apparently influenced in part by the fact that Asturizaga was having an affair with Susie Baker-Lapp, an FCS teacher who was having an affair with the FCS school headmaster, Defendant, Goss.

125.   After FCS terminated Asturizaga following the 2003 criminal prosecution for sexual abuse of a minor in Prince George's County, Asturizaga revealed the Goss/Baker-Lapp affairs to their spouses in an apparent attempt to get even for terminating his employment at FCS.

126.   Thereafter, both Goss and Baker-Lapp were divorced by their spouses.

127.   At all times after 1993, Defendants knew or should have known that Asturizaga presented a risk of danger to Plaintiff not only on FCS school property during FCS school and camp time, but off FCS property as well (especially given their knowledge that Asturizaga was babysitting HT and driving HT back and forth to FCS and summer camp after expelling her in 1999).

128.   At all times from 1993 to December ▇ 2002, it was foreseeable to Defendants that  Asturizaga's public and private inappropriate acts, all performed within the scope of his employment with AFM t/a FCS and then FCS, could cause harm to Plaintiff and other minor female FCS students and campers, including the harms alleged herein.

26

129.    Moreover, at all times from 1993 to December ▮ 2002, it was foreseeable to BYM, AFM and FCS that the failure of Defendants Manring, Smith, O'Neil-White and Goss to properly hire, train, retain and supervise Asturizaga or conduct a background check on him could likely cause harm to Plaintiff and other minor female FCS students and campers, including the harms alleged herein.

130.    Defendants' collective failure to act to protect Plaintiff as described herein created the opportunity for Asturizaga to groom, and then sexually abuse Plaintiff, both on FCS property and off for which they are directly and vicariously liable.

131.    As a direct and proximate result of Defendants' individual and collective actions and inactions as set forth herein, Plaintiff suffered and continues to suffer tremendous emotional, psychological and physical trauma including stress, emotional distress, humiliation, anxiety, and pain and suffering and to incur special damages, including medical expenses, loss of income and other monetary expenses.

<u>Baltimore Yearly Meeting</u>

132.    The process of becoming a newly recognized monthly meeting in the BYM region, concludes with the grant of a charter by the BYM to the Monthly meeting, subject to BYM's control and guidance and BYM's governing documents and rules and regulations.

133.    Under its governing documents, BYM has the power to remove the charter of a monthly meetinghouse. In case of removal, all property, real and personal, automatically conveys from the removed monthly meeting to BYM by operation of the BYM organizational rules.

134.     At all relevant times, each Monthly Meeting members paid a yearly "apportionment" fee to BYM in an amount set by BYM.

135.     At all relevant times, BYM owned and operated a number of Quaker retreats in Maryland and Virginia including:  Camp Catoctin in Maryland, the Shiloh Quaker Camp in Stanardsville located in Madison County, Virginia; the Opequon Quaker camp located in Winchester, Virginia; and a "Teen Adventure" Camp located in Lexington, Va.  According to its website, it has charged campers $950/week or more to attend the Virginia camps.

136.     The officers of BYM are made up entirely of members of the BYM member meetinghouses, such as AFM.  At various times from 1992-2002, one or more BYM officers were members of AFM.  BYM indicates on its website that it has "9 Friends Schools operating within the geographic boundaries of the [BYM]".  One of the listed schools is FCS.

137.     From its inception until some point after 2007, AFM unilaterally appointed all of the members of FCS's board of directors from AFM's congregation.

138.     Moreover, for a period of time after June 15, 1998, FCS held its corporate board meetings at AFM in Prince George's County Maryland.  Moreover, in its meeting minutes after June 15, 1998, AFM indicates repeatedly that all members of AFM were also members of the FCS corporation.

139.     At all times prior to 2005, FCS regularly participated in AFM meetings and reported to AFM which exercised ultimate control over FCS affairs and policies.

140.     Moreover, AFM participated directly in the adoption of and changing of FCS's corporate by-laws during and following the relevant time period.

28

141.   AFM reports on its website that all FCS students visit the AFM  at least once in the fall with transportation provided by  BYM.

142.   Moreover, all FCS students are required to attend Camp Catoctin in Maryland for periodic Quaker retreats. BYM owns Camp Catoctin.

143.   Plaintiff attended Camp Catoctin at least once a year from 1993 to 1997 where she was abused by Asturizaga.

144.   At all times prior to 2005, neither BYM, FCS or AMH had an express written sexual abuse policy that was enforced in any way. However, in 2005, BYM, FCS and AMH all developed and passed a written sexual abuse policy at the insistence of, and under the direction of BYM and its then insurer, GuideOne of West Des Moines, Iowa.

145.   Effective January 1, 2001, BYM, AFM and FCS jointly applied to GuideOne Insurance of Iowa for multiple lines of insurance. Thereafter, all three of the Friends Defendants were jointly insured under the same policy issued by GuideOne Insurance of Iowa.

146.   The AFM Minutes from its March 13, 2005 meeting states as follows:

147.   Report from Youth Safety Meeting – June Conference

     a.   Baltimore Yearly Meeting is in the process of writing a policy on sexual conduct and is asking monthly meetings to do the same.  BYM had received a mandate from its insurance company saying that guidelines needed to be set by December 1, 2004.  By this date, however, not one monthly meeting or BYM had complied.  People were working in good faith but had not worked fast enough.  The insurance company, Guide One had agreed to meet with Friends on March 5 and cancelled the December 1 deadline.  Representatives of BYM's monthly meetings attended this meeting.

148.    BYM, AFM and FCS eventually adopted a written sexual abuse policy which, among other changes, mandated that all observed or reported incidents of possible sexual abuse be reported to Maryland authorities, as required of all "educators" and "human services workers", such as BYM, AFM and FCS and their employees, officers and board members by Maryland law since at least 1984.  Educators and Human Service Workers, such as Defendants, are granted immunity under Maryland law for any civil liability for making a good faith report of suspected sexual abuse, even if later found to be erroneous or unsubstantiated.  Similar reporting requirements are mandated by statute in most other states, including New Jersey, New York, Virginia and the District of Columbia.

149.    Defendants, FCS, AFM,  BYM, O'Neil-White and Goss,  each knew of repeated concerns expressed by various FCS parents and FCS employees concerning Fernando Asturizaga's  inappropriate behavior toward Plaintiff and other FCS students, as set forth in this Complaint, and not only failed to report the sexual abuse in violation of Section 5-704 of the Maryland Family Law Article, but failed to take any reasonable steps to protect Plaintiff from numerous incidence of  sexual  abuse, rape and sodomy  that occurred thereafter, both inside and outside of FCS school property, including in Virginia, at the hands of Asturizaga, a long time FCS employee and FCS summer camp director.

150.    The purpose of the Maryland reporting statute, as well as similar statues in Virginia and throughout the country is to protect minors, such as Plaintiff from sexual abuse at the hands of sexual predators such as Defendant, Asturizaga. In fact, the Maryland legislature expressly stated that the purpose of the reporting requirement for "Child Abuse and Neglect" was to protect children who have been the subject of abuse or neglect. The similar reporting requirements in other states serves an identical purpose.

30

**COUNT I**
**(NEGLIGENCE PER SE CAUSING SEXUAL ABUSE OF MINOR)**
**(All Defendants)**

151.    Plaintiff incorporates the allegations of ¶¶ 1-150 above.

152.    As a minor child enrolled at FCS and the FCS summer camp, Defendants owed Plaintiff a special duty to protect her from foreseeable harm and to report any reports of suspected child abuse to the proper Maryland authorities as required by Md Code, Family Law Art., §§ 5-704 and 5-705 and similar reporting laws of Virginia, New Jersey, New York and the District of Columbia ("the reporting laws").

153.    At all times between 1993 and December 7, 2002, Defendants breached their individual and collective duties of care owed to Plaintiff by failing to report suspicions that Plaintiff and other FCS students and/or camp attendees were subjected to suspected child abuse at the hands of FCS employee, Asturizaga.

154.    Defendants' individual and collective failures to comply with the reporting laws were a proximate cause of Plaintiff's injuries alleged herein.

**COUNT II**
**(NEGLIGENCE/GROSS NEGLIGENCE CAUSING**
**SEXUAL ABUSE OF MINOR)**
**(All Defendants)**

155.    Plaintiff incorporates the allegations of ¶¶ 1-150 above.

156.    The Non Asturizaga Defendants breached their duty of reasonable and/or heightened care in failing to properly hire, train, and supervise Asturizaga and/or to investigate the reports of suspected abuse against Asturizaga or to otherwise take reasonable steps to protect Plaintiff from sexual abuse.

157.    In fact, FCS failed to do any background check on Asturizaga prior to hiring him to work with children at FCS, failed to check any references on him prior to

hiring him, routinely overlooked inappropriate behavior by Asturizaga toward minor female students,   and routinely allowed him to be alone with individual minor female students, including Plaintiff, in FCS classes and other rooms that had no windows at FCS, as well as off school property.

158.    Defendants BYM, FCS, and AFM and their boards were also negligent and/or grossly negligent in their failure to train their employees and agents, including Defendants, Manring, Smith, O'Neil-White and  Goss, on the implementation of appropriate standard operating procedures for the protection of minors, including but not limited to the implementation of and training in standard operating procedures to protect minors from inappropriate behavior by FCS teachers such as Asturizaga.

159.    Moreover, during the initial phase of his grooming of Plaintiff, Asturizaga's conduct toward Plaintiff was negligent but not intentional in that he was never trained or instructed by BYM or AFM t/a FCS or Manring regarding appropriate and inappropriate physical and verbal interactions with minor female students such as Plaintiff.

160.    At some point thereafter, Asturizaga's inappropriate verbal and physical interactions with Plaintiff and other minor FCS female students and campers transitioned from inappropriate behavior to intentional and abusive behavior.

161.    The Defendants' negligence and/or gross negligence as described herein created the opportunity for Asturizaga to sexually abuse Plaintiff for a period of years, both on and off FCS property and in and outside of Maryland, and was thus a proximate cause of that abuse.

162.     FCS was the alter ego of AFM given AFM's extensive and unilateral control over FCS at all relevant times. Thus AFM is liable to the extent of FCS's liability.

163.     Moreover, AFM is also liable for its own failure to report the suspected abuse of Plaintiff and other FCS students, and vicariously liable for the sexual abuse committed by Asturizaga within the scope of his employment, and the negligence of their agents/employees Manring, Smith, O'Neil-White and Goss.

164.     Likewise, BYM had the right to exert complete control over AFM, including seizing its charter and shutting it down, and is thus vicariously and directly liable to the extent of AFM's liability.

165.     BYM is also directly liable for its own failure to report the suspected abuse by Asturizaga or to take reasonable actions to protect Plaintiff such as mandating a lawful sex abuse policy for the protection of minors,  such as Plaintiff, during the relevant time period.  BYM is also  vicariously liable for the negligence of AFM and FCS, and their employees and agents, including Manring, Smith, O'Neil-White and Goss,  who operated at all times within the control of BYM, especially in terms of AFM's and FCS's respective policies, or lack thereof, regarding sexual abuse of minors during the relevant time period.

166.     As a result of Defendants' collective and individual actions and inactions, Plaintiff suffered and will continue to suffer severe, emotional and physical pain and distress, as well as other damages alleged herein.

## COUNT III
## (BREACH OF FIDUCIARY DUTY/SPECIAL RELATIONSHIP CAUSING SEXUAL ABUSE OF MINOR)
### (All Defendants)

167.     Plaintiff incorporates the allegations of ¶¶ 1-150 above.

168.     Defendants owed Plaintiff a heightened duty of care given her young age, her status as minor student, volunteer and camp attendee and her yearly compulsory attendance at Camp Catoctin while she was a student at FCS, and given the special relationship that existed between Plaintiff and all Defendants for which BYM is legally responsible given their high level of control over the activities of FCS and AFM and their employees/agents, especially with regard to AFM's and FCS's respective policies, or lack thereof, for the protection of minors from 1993 to December █ 2002.

169.     Defendants breached their heightened duty of care causing damage to Plaintiff as alleged herein.

### COUNT IV
### (SEXUAL ABUSE OF A MINOR)
### (All Defendants)

170.     Plaintiff incorporates the allegations of ¶¶ 1-150 above.

171.     During the time period that Defendant Fernando Asturizaga engaged in numerous incidents of sexual abuse of Plaintiff, including digital sexual penetration on at least 1occasion, Plaintiff was 13 or younger.

172.     As such, Plaintiff was legally incapable of consenting to the sexual contacts detailed herein.

173.     Moreover, during the time period from December █ 1998 and December █ 2002 (when Plaintiff was between the age of 14 and 17), Asturizaga was between the ages of 32 and 36.  Given the disparity in ages, Plaintiff was legally incapable of giving consent to sexual contact to Asturizaga during that period.  Sexual contact during this time period included digital sexual penetration on at least 2 occasions.

34

174.     In fact, at no time from 1993 to December █ 2002 did Plaintiff consent to any of Asturizaga's sexual contact and sexual advances.

175.     The conduct of Defendant Asturizaga violated Md. Criminal Code §§ 3-306, 3-307, 3-308, and 3-312, as well as similar criminal statutes in effect in Maryland, Virginia, the District of Columbia, New Jersey, and New York from 1993 to December 7, 2002, causing the damages to Plaintiff as alleged herein.

176.     All of the Defendants are directly and vicariously liable for Asturizaga's sexual abuse of Plaintiff committed during and within the scope of his employment at AFM t/a FCS and FCS (both under the control of BYM and the various Defendant heads of school).

177.     Defendants breached their heightened duty of care causing damage to Plaintiff as alleged herein.

### COUNT V
### (ASSAULT)
### (All Defendants)

178.     Plaintiff incorporates the allegations of ¶¶ 1-150 above.

179.     During the time period that Defendant Fernando Asturizaga engaged in the sex acts alleged herein  with  Plaintiff, she was 13 years of age or younger and was legally incapable of consenting to any sexual contact, including digital penetration of her vagina on at least three separate occasions while she was a minor and the other sexual contacts detailed herein.

180.     Asturizaga acted with the intent and capability to do bodily harm to Plaintiff.  Moreover, his conduct was perpetrated with evil motive and/or actual malice

181.    The conduct of Defendant Asturizaga repeatedly put Plaintiff at risk of imminent bodily harm causing damages to Plaintiff as alleged herein.

182.    Moreover, all of the Defendants are vicariously liable for Asturizaga's assault of Plaintiff committed during and within the scope of his employment at AFM t/a FCS and FCS (both under the control of BYM and the various Defendant heads of school).

183.    Defendants breached their heightened duty of care causing damage to Plaintiff as alleged herein.

**COUNT VI**
**(BATTERY)**
**(All Defendants**)

184.    Plaintiff incorporates the allegations of ¶¶ 1-150 above.

185.    Defendant, Asturizaga's conduct as alleged herein constitutes an intentional offensive touching and was undertaken deliberately, with actual malice and without lawful consent in violation of the Maryland Criminal Code in effect at the time the acts were committed and similar criminal statutes in other states and the District of Columbia where Asturizaga's sexual abuse of Plaintiff occurred.

186.    As a result of Defendant, Asturizaga's conduct, Plaintiff suffered damages alleged herein.

187.    Moreover, all of the Defendants are directly and vicariously liable for Asturizaga's battery of Plaintiff committed during and within the scope of his employment at AFM t/a FCS and FCS (both under the control of BYM and the various Defendant heads of school).

188.    Defendants breached their heightened duty of care causing damage to Plaintiff as alleged herein.

## COUNT VII
### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS ARISING OUT OF SEXUAL ABUSE OF MINOR)
### (BYM, AFM, FCS, ASTIROZGA and GOSS)

189.    Plaintiff incorporates the allegations of ¶¶ 1-150 above.

190.    Defendant, Asturizaga's conduct in sexually abusing Plaintiff when she was a minor was intentional, extreme and outrageous, and beyond all bounds of decency in society.

191.    Goss' intentional refusal to investigate the many allegations against Asturizaga or to stop Asturizaga from abusing Plaintiff was driven by the fact that Goss and Asturizaga were having an affair with the same woman, FCS teacher Susie Baker-Lapp and Goss did not want this fact exposed to his wife.

192.    The intentional actions and inactions of Asturizaga and Goss, for which BYM, FCS and AFM are vicariously liable since they were committed within the scope of employment and/or agency, were intentional and showed a complete  disregard for Plaintiff's safety and well-being despite a high degree of probability that emotional distress and physical harm would result to Plaintiff from their actions and inactions.

193.    As a result of Defendants' collective and individual actions and inactions, Plaintiff suffered and will continue to suffer severe, emotional and physical pain and distress, as well as other damages alleged herein.

## COUNT VIII
### (Title IX violation – 20 U.S.C. § 1681, et seq.)
### (All Defendants)

37

194.    Plaintiff incorporates the allegations of ¶¶ 1-150 above.

195.    BYM, AFM t/a FCS and FCS at all times were and are educational programs that receive federal financial assistance in the form of non-profit tax-free status granted by the IRS.

196.    From 1992 through December ▌ 2002, heads of school, Manring, Smith, Goss and O'Neil-White as well as various members of the boards of BYM, AFM/FCS and FCS had actual notice of Asturizaga's sexual harassment and highly inappropriate sexualized behavior around numerous young female students, including Plaintiff.

197.    Despite that knowledge, Defendants were deliberately indifferent to Asturizaga's misconduct, both as to Plaintiff and multiple other young female students.

198.    Despite Defendants' knowledge of Asturizaga's history of sexual assault and battery of minor female students from 1993 through December ▌ 2002, Defendants continued to condone Asturizaga's behavior by failing to take action against him or to take any actions, much less adequate action, to protect Plaintiff.

199.    Asturizaga's sexual misconduct of Plaintiff from 1993-2002 was so severe or pervasive as to deny Plaintiff educational opportunities during that entire time period.

200.    As a result of Defendants' collective and individual actions and inactions in violation of Title IX, Plaintiff suffered and will continue to suffer severe, emotional and physical pain and distress, as well as other damages alleged herein.

## COUNT IX
## (FALSE IMPRISONMENT RELATED TO SEXUAL ABUSE OF MINOR)
### (All Defendants)

201.    Plaintiff incorporates the allegations of ¶¶ 1-150 above.

202.    On numerous occasions between 1993 and December █ 2002, Asturizaga either negligently or intentionally placed Plaintiff in various situations where she felt confined and not free to leave such as bringing her alone into various rooms without windows at FCS and closing the door or by grabbing and holding Plaintiff and refusing to let her go.

203.    At no time on these occasions did Plaintiff consent to Asturizaga depriving her of her right to personal liberty and freedom of movement.

204.    On each such occasion - estimated to be over 25 times from 1993 to December █ 2002 – Plaintiff was deprived of her freedom of movement for periods lasting anywhere from 10 seconds (in the case of a bear hug) to two hours in the case of Asturizaga bringing Plaintiff alone into an FCS room, closing the door and not allowing Plaintiff to leave, often while he sexually abused her in various ways).

205.    As a result of Asturizaga's actions, for which the other Defendants are vicariously and directly liable, Plaintiff suffered damages alleged herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for a judgment against Defendants, jointly and severally, and for the following relief:

A.      That judgment be entered in favor of Plaintiff, Jane Doe, and against all Defendants for compensatory damages in the amount of $25,000,000 (twenty-five million dollars) and punitive damages in the amount of $75,000,000 (seventy-five million dollars) or such other amounts as shown to be reasonable and just by the evidence;

B.     That all costs of this action be assessed against Defendants, including all reasonable attorneys' fees, costs and expenses of this action;

C.     That prejudgment interest be awarded from the date of injury  at the legal rate, and following judgment interest at the post judgment legal rate;

D.     Such further relief as the Court deems just and proper.

### JURY DEMAND

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial for all issues that can be triable by the jury.

Respectfully submitted,

By: */s/ John J. Beins*
John J. Beins, Esq. Bar No.08694
jbeins@beinsgoldberg.com
Seth D. Goldberg, Esq., Bar No. 23059
sethg@beinsgoldberg.com
Beins Goldberg, LLP
2 Wisconsin Circle, Suite 700
Chevy Chase, Maryland 20815
Tel: 240-235-5040

*Counsel for Plaintiff Jane Doe*